Your Honor, may it please the court. My name is Jeremy Francis with the Salter Law Group. I represent plaintiff appellants Balmore Prudencio and Michelle Quintero. I'd like to reserve five minutes for rebuttal. We'll see how long I go here though. Again, may it please the court, this case is about whether statements by the managers and directors of the defendants that they oversee all aspects of the marketing of soap products in the United States is sufficient to plausibly allege that they participated in an external Yes, I can. This is Richard, the operator. Your audio has broken down considerably. It may be in your best interest to continue by phone. You can keep your video up, but your audio might be best coming in by phone. But also, when I tried to talk to you, you didn't stop or you couldn't hear me. I tried to say something. Judge, it appears that Mr. Francis is... Yes, why don't I dial back in by... I'm sorry, Your Honors, can you hear me? Yes, now we can hear you. But can you hear us? Yes, I can, Your Honor. Before, when I talked to you, you didn't stop. Was that because you didn't stop or because you didn't hear me? Because I didn't hear you, Your Honor. I apologize. Was there a question I'd like to answer? No, the question was that we couldn't hear you. I simply wanted to point out that we weren't hearing you properly, but you didn't stop what you were saying, so I thought you weren't hearing us either. So, let's see if we can continue. Go ahead. Why don't I continue? I suppose if this becomes an issue, I will dial back in by phone. We'll see if we can correct the technical difficulties. I apologize for that on my end. As I was saying, the plaintiffs in this case allege that they purchased certain soaps manufactured by a Mexican firm. The complaint alleges that the natural soaps labeling on the soaps is deceptive and misleading because the soaps, in fact, contain numerous synthetic ingredients. The complaint itself uses defendants' own words taken from their websites, press releases, and statements by the officers to plausibly allege that both defendants, Greasy and Midway, participated in and exercised unbridled control over the labeling of the products at issue. Specifically, the complaint sets forth five facts which plaintiff believes inevitably lead to the conclusion, or at least plausibly demonstrate, that one, the defendants participated in the labeling of the products, that they specifically participated in the labeling of these soap products at issue, and that they exercised a high degree of control over the labeling itself. I'll run quickly through what those facts are as they're alleged in the complaint. The first is that the CEO of the Mexican firm that manufactures the soaps stated in a press release that they bought a majority share in Defendant Midway in order to, quote, have greater control of the marketing of its products in the United States. Second, both defendants jointly employed business managers who were responsible for the marketing of the products in the United States. Third, a director of planning for the Mexican firm described the role of the Defendant Midway as marketing, quote, soaps and beauty products in the United States. Fourth, a business manager and marketing strategist who was jointly employed by both defendants described his role as overseeing all aspects of marketing of the greasy brands within the United States. And finally, the website for Defendant Midway states that it provides suppliers and merchandisers with a, quote, comprehensive distribution strategy that includes marketing and promotions. But there's also more general allegations that they are responsible for labeling, marketing, and advertising. They authorized the misleading and deceptive advertising statement. That's correct, Your Honor. The five facts that I've listed provide additional support for those general statements about the responsibility that these defendants bear for the labeling of these products. What is your understanding of the governing rule here? The case from which all of this derives says, as I recall, that distribution can be sufficient. And that was a case that was dealing with a credit card company's responsibility. And this is the Emory case. And I'm just wondering whether, do we have any, does the Ninth Circuit have a case which suggests that direct distribution is not sufficient? Emory says that Visa exercised no control over the preparation or distribution of this case. It's clear that your clients are at least the distributors of this product. Is there a Ninth Circuit case that says that that's not sufficient? I'm not aware of a Ninth Circuit case that's not sufficient. I believe that both the defendants, appellees, as well as the plaintiffs are operating with the understanding that the standard here is that the plaintiffs must plausibly allege that the defendants both participated in and exercised unbridled control over the labeling of the products. I'm just not even sure that's the rule, but if you're willing to undertake that, that's fine. And so, again, the five facts that I've gone through, I think each one of them in and of itself provides a piece of the puzzle as to, for a plausible allegation that meets that standard of participation in an unbridled control. You've got a statement that. If we can go through the different entities. First, Midway distributor and generally distributor really isn't involved in labeling. I mean, what they do is they find market stores that will carry the products, make sure you get the reach of the market. You know, they may be involved in negotiations with maybe the shelf space at a store, but generally distributors aren't really involved in labeling. I mean, that's the company that manufacturers typically does the labeling of the product. Generally, I would agree with you, Your Honor. I think there are several allegations in the complaint that suggest a broader role for Midway, specifically the idea that they are involved in all aspects of marketing, as well as providing a comprehensive marketing strategy. And respectively, the specific role that they may play in the labeling is an issue of fact that are suited for summary judgment. I think that the allegations, again, using the words of the defendants themselves, plausibly set forth a scenario in which they are indeed responsible for the labeling of these products. Especially when you consider just in general, the idea of marketing can and does include labeling as set forth by several articles that are cited in the briefing from the American Marketing Association. They discussed the importance of forward-facing labeling or customer-facing labeling in marketing a product. This is not, for example, these are not decisions regarding the size of the font or the color of the packaging. They are decisions about representations that are meant to draw in customers. And I think under most definitions of marketing, that labeling fits comfortably within that space. I have a question. What is your best case that this is valid and that you should proceed? Are you depending upon a case or Supreme Court case or something else? Your Honor, the best case is the Sims case cited in the briefing. I believe it's a Central District of California case from 2018. That's a case in which an advertiser, the court found that the plaintiffs had sufficiently pled that an advertiser was responsible for writing the copy on the advertisements and labels for the manufacturer. This was a, I believe it was a supplement that was allegedly deceptively advertised. The plaintiffs sued both the manufacturer of the supplement as well as the advertiser. And the only allegation in that complaint was that the advertiser themselves wrote and were responsible for the alleged misrepresentation. And that's exactly what we have in this case, except that we have additional facts to support that contention. Your Honor, you are alleging claims under both the UCL and the CRLA, is that what it's called? CRLA, yes. So the question is, as to the second, Emory was not about CLRA. Are you arguing that this rule doesn't apply under that statute, and if so, why? Well, Your Honor, for one, you are correct that Emory was a UCL case that did not address the CLRA. And there is a split among the district courts as to whether the participation… But we're an appellate court, and we need to decide something. So I'd like an argument, not simply an account of what a district court said. Yes, Your Honor. Thank you. Well, the CLRA, the unbridled control and participation in standards should not apply to the CLRA, because it is broader as far as its remedies go than the UCL is. The remedial nature of the CLRA is clear in the remedies, the extensive remedies that it allows for, including criminal violations punishable by fine or imprisonment. One might argue that that should make it less likely to extend to less culpable people, so I don't understand that argument. Well, I think what it signals is a desire by the legislature to hold people, companies, who participate in any fashion in mislabeling or misleading representations to be held accountable. Okay, if you wanted to reserve five minutes, you're down to less than four, so thank you. I'll reserve the rest of my time. Thank you. Mr. Andre. Good morning, Your Honor. Jean-Claude Andre on behalf of the defendants' appellees. I want to start by reminding the Court that this was plaintiffs' fourth complaint overall that is now before the Court. To the extent that there's any concern that the District Court moved too quickly in dismissing this case with prejudice, the plaintiffs had four chances to properly plead plausible claims against... They publicly pled that these entities, which were closely connected to the manufacturer, so it's less implausible one way, more plausible than with regard to a completely hands-off organization, was in control of the labeling, and I don't understand why that's not sufficient right there. I'm sorry, Your Honor, you were very... I don't understand why that's not sufficient. They said that these entities, which were closely related to the manufacturer, were responsible for the labeling and authorized the labeling. Why isn't that the end of the story? Well, because plaintiffs' allegations are, as you noted just now and as you noted earlier with my colleague, plaintiffs' allegations are that these defendants are responsible and authorized the labels. That is the sum total of their allegations as to responsibility. Why is that not enough? Because, Judge Burson, those allegations are conclusory. This is a case not about marketing. They're conclusory, but they're specific and they're definitive, and I don't know why they need to say anything more than that. Iqbal Twamely can get completely out of control. They said that these people authorized the labeling. That is a statement of fact. Why do they have to say anything more than that? They have to say more than that because, as Iqbal and Twamely teach, and as this Court's precedent unpacking Iqbal and Twamely, and in particular, I'm thinking about the Eclectic Properties case, the Summers v. Apple case, the plaintiffs have to allege specific facts supporting their top-level allegations. They have to allege specific facts that disprove effectively. This is not a legal conclusion. It is a statement that they authorized the labeling. Correct. That's a factual statement. It's not a statement that says something like, in a discrimination case, they discriminated against you because of race. It is a statement of – it's not about somebody's mind. It's a statement of fact. I don't understand why they have to say anything more than that. Well, again, both Eclectic Properties and Summers v. Apple teach that where there are other plausible explanations that are more defendant-friendly that can be gleaned from the complaint, the obligation is on the plaintiff to plead additional factual matter that disprove or would disprove the innocent explanation. So in Eclectic Properties, it was involving a bunch of real estate transactions gone bad and losses by the plaintiffs, and this court said that under Iqbal and Twombly, the plaintiffs had to prove that this was more than just real estate transactions gone bad because of a recession. In Summers v. Apple, the issue was why was Apple keeping the prices for its songs on iTunes so low, and this court recognized that there are many plausible explanations, including that Apple wanted to keep a stranglehold over its customers with respect to the iPod on which the songs were played or other Apple products. If they didn't authorize the labels, that would be a contradiction of what they... In other words, I don't see this as a question of plausibility. All right, let's leave that aside for now. Second of all, I, as I said before, don't understand how one gets from Emory the notion that a distributor who distributes products with certain statements is not responsible. That's not vicarious liability. That's another reason it seems to me this thing has gotten way away from what Emory was about. It's not vicarious to say that if you distribute something and present to the public something with a false statement that you're responsible for, that's not like saying that an employer is responsible for what an employee does or a corporation is responsible for all its employees. It's not vicarious. So where are you getting that from? Well, there are two portions of Emory that are relevant here, Judge Berzon. One is on page 960 where they talk about no vicarious liability. And I understand your point that Emory could be read a little too broadly as to certain fact patterns. And I think the lower courts have sensibly recognized as much. But there's another portion of Emory that's relevant too, and that's on page 964 of that decision. There the court said that in the advertising context, and this is reflective of both the California legislature's policy views and the California Supreme Court's policy views, with respect to advertising matters, other entities, distributors, retailers, have no obligation to verify the veracity of the statements made by the manufacturer or by the labeling party. And so when you put those two pieces together, I think that's where we get to where we are here. What portion are they talking about? Again, this is very hard to read this way, but I'll see if I can find it. So page 960 was the vicarious liability discussion. 964 is the discussion of the lack of an obligation to verify the veracity of a manufacturer's claims on its labels. But I do want to get back to my point about the fact that plaintiff's allegations here do not plausibly allege liability as to my clients. So in order for them to establish direct participation and unbridled control, plaintiffs have to allege more than just involvement in marketing. What's peculiar about this case, and unlike all the other ones that we've been debating in our briefs, which are mostly district court decisions, what's peculiar about this case is that we came in and we told the plaintiffs and the district court three times over that Greasy Mexico manufactures the product, puts the label on, and sends it out shelf ready. And under Twombly, district courts are now charged with applying common sense and using their judicial experience. And so when one party – and this is not an empty chair defense like you see in the criminal context where one defendant says, oh, that guy did it. I mean, this is Midway, which has firsthand knowledge of how it receives the products, and it receives the product. Is that inconsistent with the statement that they authorized the labels and that they composed the labels? Is it inconsistent? Yes. Well, you say you told them. I mean, it still could be that the representatives in the United States had to approve what was on the label. I guess theoretically it could be, but what we know – And that's what it says in the complaint. Well, no, we actually do have more than that, right? So what we said on SCR page 53 is that the Mexican company manufactures and labels the products, that Midway is nothing more than an importer and distributor. And then at the hearing on that motion to dismiss, said Midway is a middleman distributor. It takes the product and gives it to a retailer, and it does nothing more and nothing less. All right. Well, then you should file Rule 11 and say that what they're alleging is false. But that's what they've alleged. They've alleged otherwise. I take your point. But Rule 11 is strong medicine that we don't like to use. Yes, but we're on a complaint, and they've alleged otherwise. But my point is that when we come in and we basically conduct the reasonable investigation that Rule 11B requires the plaintiffs to conduct before filing a complaint, we tell them this in numerous filings. In addition to the two documents I just mentioned, the motion to dismiss the first amendment complaint and the hearing transcript, actually our Rule 26F conference report was the clearest statement of all as to what greasy Mexico's role was here. That's docket entry number 25. So repeatedly we are telling them, you are suing the wrong defendants. The two that you are looking at have had nothing to do with the marketing or nothing to do with the labeling. And yet they continue to come forward. But the district court, which is observing all this in real time, can under Twombly in light of its experience of common sense say, yeah, you know, maybe their allegations would come close in a vacuum, but on their fourth complaint when the two defendants before the court, the two defendants with firsthand knowledge of how the products move from greasy Mexico into the United States, which is too midway, when they come in and they say, you've got the wrong people, when the subsidiaries say, sue my parent, the district court I think under Twombly is free to say, yeah, you know, I'm not going to let this go forward because, you know, you're not listening to the people that are saying, sue my parent. To me, it's a rule 11 argument. You know, you're saying that what the alleged is false. Well, you're not saying that the alleged, you're saying what the alleged was false. I mean, right. I understand. Again, we didn't want to seek rule of rule 11 remedy here because that's just too strong a medicine. But in addition, with respect to the rule 11 B obligation the plaintiffs had to conduct investigation, if they really conducted investigation, they would see that greasy United States has no physical plant in the United States and no employees. So, again, it comes back to Mr. Francis says, you know, we have these five allegations that supposedly put the media. They didn't say in the complaint that they put the labels on. They said that they authorized the labels and that they were responsible for the labels. They didn't say that they physically put them on. That's correct. But if greasy USA is just a holding company with no operations, no employees, it can't possibly have authorized or be responsible for anything. And midway was abundantly clear throughout these three different phases of the case in that it is a middleman distributor that does nothing more and nothing less. And so I, you know, this is why we said at the beginning of our motion to dismiss this complaint, we don't understand why the plaintiffs didn't just sue greasy Mexico. I mean, it's, it's not that hard to serve them under the Hague convention. You translate the complaint, you send three copies to the Mexican central authority. Yeah. Maybe it takes, you know, nine months for service to be affected, but it happens. And so that is why the district court in our view was correct in saying, look, you know, again, the subsidiaries told you sue the parent. I told you I, the district court told you sue the parent and you didn't do it. And this is your fourth complaint. Now it's time for everybody to move on. I have no idea why they didn't sue the parent, but, but I have a hard time looking at this complaint and saying it's insufficient, even if it's not true, it's not true. It's not true. They will lose. I guess the other thing I would, I would like to respond to judge Siler's question about what's the best case for plaintiffs. I, I acknowledge that the Sims case is the best case for plaintiffs. That's why we addressed it the way we did in our answering brief. But one critical distinction between the Sims case and this case is that Sims, I, one, it seems the district court case, of course, not binding on this court, but on top of that, Sims what I think did that nudges their claim into plausibility, putting apart that they don't have the backdrop that we have here of the subsidiary say, saying, sue the parent. But Sims said that the actual defense before the court, the advertising agency wrote copy affirmatively wrote copy for the V8 juices, the Campbell soups manufactured in that case. You know, we don't have that here. And I realized that I may be, you know slicing the salami a little thin, but if you were to look at all the unbridled control and, and direct dissipation cases, and I looked at them, frankly, there's about 80 hits I got on Westlaw. What you'll see is that the majority of those cases do involve dismissal. And then those that don't do have more than what we have here. And so like I said, in Sims, we think that the plaintiffs had more. There was plaintiffs were plaintiffs alleged that the defendants there actually affirmatively wrote copy in the other two cases on which the plaintiffs rely. There was more as well in Woodard, the ingredient suppliers. So it wasn't downstream. It was an upstream defendant. The ingredient suppliers of the product provided the marketing materials themselves to the, to the manufacturer. And there was a contract specifying that the ingredient suppliers had to provide written approval of the packaging. And that's more than what we have here in Dorfman. The retailers contracted to promote the statements. They disseminated pictures of the misleading labels in the opinions, not super clear as to how they did that beyond the website, but they certainly did that on their website. So again, you have more affirmative conduct than just general allegations about marketing, which is when you go one layer beyond the two allegations that you and I discussed earlier, judge Burzon about responsibility and authorization. When you look at these five things that Mr. Francis says, put the meat on the bones of their allegations. They're all about marketing. I mean, you know, so yes, greasy Mexico owns greasy USA and greasy Mexico acquired a majority share of Midway, but that says nothing about who's responsible for the labeling, who makes the decision as to what goes on the label Midway's website saying that it provides, you know, full service marketing to its clients. Marketing may include the labeling. It may not as judge Lee noted. Marketing could very well sentence is number nine, paragraph 19. At least since that time, grissy USA and Midway have operated as a common enterprise while engaging in the acts and practices and other violations of law alleged here, including labeling marketing and advertising the products as natural. Right. So those, again, those are, in our view, the, the legal conclusions or the two conclusory allegations, and then they have to support it under the collective conclusion. It says that they engaged in the acts and practices, including labeling and other violations of law, including labeling. That's the harm that they're complaining about. And as Iqbal and Twombly teach that you can't say, you know, just say somebody harmed me. You have to say more. And so again, I realize that plaintiffs have tried to say more. That's the five items that Mr. Francis discussed at the outset, but all five of those items just go to marketing. They do not go to labeling. So they do not take the general allegations about marketing. And, and if true, establish that these two defendants had any role in the labeling, right? First of all, why isn't advertising enough? Why would it have to be labeling? Because the plaintiffs here didn't rely on any other forms of advertising. So actually as a matter of law, the only marketing or consumer facing marketing or advertising that could be relevant is the actual product label on the box, because they did not allege that they looked at websites. They did not allege that they looked at any signage. It was based on the label and labeling alone. And so this is a case about the label. And again, our position is that the allegations and, you know, you've identified the three, Judge Berzon, there are three allegations that in our view too conclusorily assert that these defendants are responsible for the labeling. And they're too conclusory because under Iqbal, Twombly, eclectic properties, Summers, the plaintiffs have to put more meat on those bones and the five pieces of meat they've attempted to put on those bones are insufficient, particularly against the backdrop of the representations that we made subject to Rule 11 against us as to how the products are manufactured, labeled, and shipped to Midway and then to retailers. I mean, you certainly cannot rely on your representation to know that the world will be willing to incorporate them into Rule 11 motion to prove that these things weren't true. Right? Correct. It's almost off, you know, discussion off the record is not relevant. It might've been relevant. You made it relevant, but you didn't. Well, again, I think that under Twombly because it is the standard that allows, you know, courts to apply common sense and their experience that it is, it is fair game here. Certainly if the district court, if this was plaintiff's first complaint and we'd made those representations and the district court, you know, said, okay, get out without leave to amend. I think I'd have a problem, but all of these representations that we made about how these products are manufactured, labeled and distributed to the United States and in the United States, all those representations were made with, in response to the first amendment complaint. And so, you know, the time for plaintiffs to cure their deficiencies was with their second amendment complaint and they didn't. And so when this court analyzes, whether judge Barat properly dismissed the complaint using his experience in common sense, I think he can take into account the experience of having lived through the first amendment complaint and our representations as officers of the court, as a part representing a party with firsthand knowledge that did that judge Brock can take that into account in, in saying, yeah. Pardon me, your case, which has ever done that. I tested the complaint against representations by the opposing parties. Which were not incorporated into rule 11 motion. We're not in a, an answer. And we're simply representations made in court without any legal connection. I did your I'm, I'm not, I mean, I'm not aware of any case. And Twombly is only 13 years old, I guess is all I can say. Maybe this case will be the first. I see that I'm over my time. I thank the court for indulging me. Mr. Francis. I'll be brief. Your honors. I think judge Burzon, you hit the nail on the head. Mr. Andre has spoken about the, the lower court being able to use its experience in common sense. In actuality, what he's asked the court to do is accept before any discovery has gone forward, simply accept defendants' denials regarding the labeling at face value. And accept the representations from defendants, that they are simply middle men who receive the packaging. You're slightly treading on thin ice. Sorry? You're somewhat treading on thin ice here. Which is that if you, it turns out that these entities really have nothing to do with the labeling. I think you've got a problem. At least on the standards you're accepting it, which is that distributing it with knowledge isn't good enough. So you're, you're. You could end up with a problem if you've been told that it isn't true and you're insisting that it is true, but you're nonetheless insisting it is true. Well, Your Honor, I think as set forth in our complaint, we have ample reason to believe that it is true, given the representations by defendants themselves about how. The representations don't have anything specific to do with labeling. And is, is Mr. Andre correct that it's only the labeling that matters, not any advertising because your particular plaintiffs don't claim to have seen advertising. That's correct, Your Honor. The plaintiffs are alleging that they saw the label. And certainly marketing, if it was just marketing, I would not think this was an adequate complaint. If you just talked about marketing because marketing as judge Lee suggested can easily mean matters have nothing to do with putting the label on, but you did allege labeling. So you're going to be held to that. Understood, Your Honor. And that's the allegation here. And I think Mr. Andre has said that I think that greasy has no employees within the United States and that Midway is simply a middle man, but we allege differently and we support that allegation adequately with those, those five facts. I understand. These other facts on the label, right? The people, the other facts you have don't pertain to the label. Your Honor, I would suggest that they, they plausibly at least lead to the conclusion that the defendants are involved in the labeling. I understand that they do not mention labeling specifically, but they are broad enough certainly to encompass labeling. And at this stage, I think, you know, under Iqbal, that is sufficient to lead to the plausible inference that they are involved in the labeling. Why hasn't the plaintiff sued greasy Mexico? I know it's a bit more cumbersome to sue, but I mean, this isn't, this isn't greasy North Korea, you know, where, you know, I can maybe perhaps understand why you do so, but they're reasonable. And it seems like the plaintiffs have a remedy here and let's assume greasy Mexico. That's true. At the same time, based on our own investigation and research and the representations made by these defendants in public and on their website, it seems to me that you could run into the same situation. If you were to sue greasy Mexico, these defendants have asserted that they are in charge of the marketing for these products. It was logical to us to go after the companies that seemingly have taken responsibility for that.  I appreciate the helpfulness and we will submit Progencia versus Midway importing and ask the court and deputy whether the lawyers in the first case are now available. Yes, Judge Brisson, they're available.
judges: Siler, Berzon, Lee